**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**PATRICK L. CARRIGAN,**                                    8:05-CV-1025
                                                            (GLS/DRH)
                        *Plaintiff,*

                        **v.**

**NEW YORK STATE EDUCATION**
**DEPARTMENT**, Office of Vocational and
Educational Services for Individuals with
Disabilities**; REBECCA H. CORT,**
*as Deputy Commissioner of the New York*
*State Education Department*; **RICHARD**
**P. MILLS,** *as Commissioner of the New*
*York State Education Department*;

                        *Defendants.*

────────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**

NATIONAL DISABILITY RIGHTS            DAVID T. HUTT, ESQ.
NETWORK
900 Second Street N.E.
Suite 211
Washington, D.C. 20002

**FOR THE DEFENDANTS:**

NEW YORK STATE DEPARTMENT             JANICE A. DEAN, ESQ.
OF LAW
Albany Office
The Capitol

Albany, New York 12224

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Patrick Carrigan, a C-4/5 quadriplegic, petitioned the New York State Office of Vocational and Educational Services for Individuals with Disabilities (VESID) for continued ambulette services or for modifications made to his vehicle so that he could continue to attend mandatory employment meetings in Montreal.  After VESID denied his request for vocational rehabilitation services, Carrigan commenced this action pursuant to Title I of the Rehabilitation Act of 1973, 29 U.S.C. § 720, seeking judicial review of the April 2005 final administrative determination. *See Dkt. No. 1*.  Pending under Federal Rule of Civil Procedure 56 are defendants' motion for summary judgment and Carrigan's cross-motion for summary judgment.  *See Dkt. Nos. 30, 37.*  For the reasons that follow, defendants' motion is granted, and Carrigan's motion is denied.

### II.  Facts

VESID is the New York State agency authorized to administer federal funds made available through the Rehabilitation Act to provide vocational services to disabled individuals.  *See Def. SMF ¶3, Dkt. No. 35*.  VESID

administers a federal program under Title I of the Rehabilitation Act to assist eligible individuals to obtain and maintain their employment goals. *See id.* at ¶*4.* In 1983, Carrigan was diagnosed with C-4/5 quadriplegia. *See id.* at ¶*5.* He has no feeling from the chest down.[1] *See Def. SMF ¶6, Dkt. No. 35.* In 1985, Carrigan became a VESID consumer, and from 1985-1990, VESID provided him with van modifications, enabling him to drive a Dodge van. *See id.* at ¶¶*7,8.*

In 1993, Carrigan became a telemarketer with I-Tech Hockey, a Canadian manufacturer and distributer of hockey equipment. *See id.* at ¶*9.* To assist Carrigan with his I-Tech position, VESID provided him with a computer, adaptive equipment, special phone equipment, and computer tutoring. *See id.* at ¶*10.* At that point, Carrigan was working seventeen hours per week, earning $110.00/week. *See id.* In 1996, Carrigan requested a new van modification and a new computer system. *See Def. SMF ¶11, Dkt. No. 35.* VESID granted his request, providing him with a new van modification at a cost of $60,000.00 and a new computer at a cost of $2,800.00. *See id.* at ¶*12.*

---

[1]Carrigan adds that he has been classified by VESID as an individual with a "most significant disability" as that phrase is defined in Title I of the Rehabilitation Act of 1973. *See Carrigan SMF ¶46, Dkt. No. 37.*

In 1999, Carrigan began experiencing mechanical and electrical problems with his Dodge van.  *See id.* at ¶*13*.  Without consulting VESID, Carrigan sold the Dodge, and in September 2002, he purchased a 2001 Ford E-150 van.  *See id.* at ¶*14*.  At this time, he requested that VESID pay for a third van modification for his Ford E-150.  *See id.*  When VESID rejected his request, a hearing was conducted on April 3, 2003 by an impartial Hearing Officer.  *See Def. SMF* ¶*15, Dkt. No. 35*.  The Hearing Officer affirmed VESID's decision, finding that Carrigan had refused to cooperate, discuss or consider developing an IPE (Individualized Plan for Employment) to modify the new vehicle, that he failed to involve VESID in his plan, and that the modification of the Ford E-150 was not cost-effective. *See id.*  At that time, Carrigan did not challenge the Hearing Officer's final determination.

A few months later, Carrigan told VESID that I-Tech was looking at a possible expansion of his duties, requiring him to travel to Plattsburgh and other accounts within a 200-mile radius.  *See id.* at ¶*17*.  VESID sought additional information through Carrigan's employer, Mr. Burns, who insisted that Carrigan be given a van modification.  *See id.* at  ¶*18.*

In 2003, Carrigan requested a revision of his IPE to reflect the

changed nature of his employment duties.  *See Def. SMF ¶20, Dkt. No. 35*.

His revised IPE noted that he was receiving rehabilitation technology only.

*See id.*  In April 2004, Carrigan asked VESID to provide him with

transportation to Montreal to attend training meetings there.  *See id.* at *¶23*.

From April 2004 through January 2005, VESID paid for 25 ambulette

service trips to Montreal for Carrigan at a cost of $401.00 per trip.  *See id.*

at *¶24*.  Carrigan's IPE was modified to include round trip ambulette service

to Montreal, but each trip was separately unauthorized.  *See Def. SMF*

*¶25, Dkt. No. 35.*

VESID claims that it discontinued the ambulette services in January

2005 when efforts to find alternative means of funding Carrigan's

transportation could not be arranged.  *See id.* at *¶26*.  To the contrary,

Carrigan claims that VESID sent two notices expressing its intent to

discontinue the ambulette services effective November 30, 2006.  *See*

*Carrigan SMF ¶26, Dkt. No. 37.*  Carrigan further contends that neither

notice explained that the reason for terminating the ambulette service was

because Carrigan's employer was uncooperative in discussing other

options.  *See it.* at *¶26*.

A hearing commenced on January 25, 2005.  *See Def. SMF ¶28, Dkt.*

5

*No. 35*.  At the hearing, a letter from Carrigan's employer, Robin Burns, was submitted, stating that Carrigan's presence was required in Montreal two to three times a month for product updates and training.  *See id.* at ¶*30*.  Mr. Burns was unwilling to either contribute to the cost of Carrigan's transportation to or from Montreal or to try alternative forms of communication, such as telecommunications or video-conferencing.  *See id.* at ¶*32*.

Also during the hearing, Carrigan testified.  He stated that he is a part-time employee earning $7.50/hour and working 15-20 hours per week.  *See id.* at ¶*34*.  He also testified that during the nine years he worked at I-Tech, he maintained the same title, only received a $1.00 per hour raise, and receives no other benefits or reasonable accommodations.  *See Def. SMF ¶35, Dkt. No. 35*.  Finally, he testified that, despite not attending meetings in Montreal between July 2002 and April 2004, he was not fired.  *See id.* at ¶*31*.

In a decision dated April 15, 2005, the Hearing Officer upheld VESID's denial of Carrigan's request for continued ambulette services to Montreal.  *See id.* at ¶*38*.  The Hearing Officer's decision stated that "the issue was solely pertaining to transportation and VESID's denial of funding

further transportation to Montreal" and that "problems with Mr. Carrigan's vehicle were beyond the scope of this hearing."[2]  *See id.* at *¶39.*

## III. DISCUSSION

**A.**    **Standard of Review - Motion for Summary Judgment and Judicial Review of an Administrative Decision Dealing with Vocational Services Under Title I of the Rehabilitation Act**

The applicable standard of review here appears to be an issue of first impression in this Circuit.  However, both parties urge the court to apply the standard of review as that applied under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482.  *See Reaves v. Mo. Dep't of Elementary and Secondary Educ.*, 422 F.3d 675, 680-81 (8th Cir. 2005) ("We conclude, therefore, that, as under the IDEA, the reviewing court should determine whether the agency's decision is supported by a preponderance of the evidence, while giving 'due weight' to the conclusions reached in the...hearing.  This rather unusual statutory standard...is more deferential than *de novo* review, and requires the district court to refrain from substituting its own notions of sound policy for those of the state

---

[2]The Hearing Officer remarked that Carrigan's employer was unreasonable in expecting Carrigan to secure state-funded transportation two to three times per month for a mere fifteen hours of work.  *See Def. SMF ¶41, Dkt. No. 35.*

Carrigan claims that this kind of travel is consistent with employment as a sales or customer service representative.  *See Carrigan SMF ¶53, Dkt. No. 37.*

authorities.").

As such, it follows that, as with the IDEA, judicial review of a decision under Title I of the Rehabilitation Act (which is brought procedurally as a motion for summary judgment), is in substance an appeal from an administrative determination.  *See Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) ("As courts in this Circuit have observed, a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact....Though the parties [in an IDEA action] may call the procedure a motion for summary judgment..., the procedure is in substance an appeal from an administrative determination, not a summary judgment.").

"Federal courts reviewing administrative determinations under the IDEA must base their decisions on a preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties."  *Grim v. Rhinebeck Centr. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).  Moreover, "[f]ederal courts reviewing administrative decisions must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to

resolve persistent and difficult questions of educational policy." *Id.* "But, the 'due weight' we ordinarily must give to the state administrative proceedings is not implicated with respect to...issues of law, such as the proper interpretation of the federal statute and its requirements." *Lillbask*, 397 F.3d at 82. "[S]tate hearing officers are not more experienced or expert than courts in interpreting federal statutes or the federal constitution, and, therefore, deference is not warranted." *Id.* Therefore, questions of law may be reviewed under a *de novo* standard. *See Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 102 (2d Cir. 1998).

**B.    The Rehabilitation Act**

"The Rehabilitation Act authorizes federal grants to states to assist the states in providing vocational rehabilitation services to individuals with handicaps." *Buchanan v. Ives*, 793 F. Supp. 361, 363 (D. Maine 1991). "State participation in the program is voluntary, but if a state chooses to participate, it must comply with federal guidelines and regulations governing the Act." *Id.*

The purpose of the Rehabilitation Act is to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive coordinated programs of vocational

9

rehabilitation and independent living, for disabled individuals, in order to maximize their employability, independence, and integration into the work place and the community.  *See* 29 U.S.C. § 701(b).  States wishing to receive federal funding under Title I must submit to the Commissioner of the Rehabilitation Services Administration a plan for vocational rehabilitation services.  *See* 29 U.S.C. § 721(a).

New York State opted to participate in the vocational rehabilitation program by implementation of the Vocational Rehabilitation Law.  *See* N.Y. EDUC. LAW § 1001 *et. seq*.  Pursuant to this statute, VESID administers the federally funded vocational rehabilitation program and promulgates rules necessary to implement the law.  *See* N.Y. EDUC. LAW § 1004; *see also* 29 U.S.C. § 721 (each State plan shall contain the plans, policies, and methods to be followed in carrying out the State plan.).  Under this law, the State Education Department has the responsibility to provide vocational rehabilitation services for disabled persons.  *See* N.Y. EDUC. LAW § 1004(9) ("Services shall be provided at a cost not to exceed that which is necessary and reasonable[.]").

Under the Rehabilitation Act, an individual is eligible for assistance if he or she is an individual with a disability and requires vocational

rehabilitation services to prepare for, secure, or maintain employment.[3]
See 29 U.S.C. § 722(a)(1)(A), (B).  (Here, neither party disputes that
Carrigan is eligible for assistance.)

In New York, the VESID is the state office assigned to develop an
Individualized Plan for Employment (IPE) that is designed to access the
individual's employment objective, consistent with the individual's
strengths, resources, priorities, concerns, and capabilities.  *See* 29 U.S.C.
§ 722.  The IPE must contain a statement of the individual's long-term
rehabilitation goals and include the method used to procure services in
meeting those goals.  *See id.*  Finally, once an individual has achieved an
employment goal, that individual's record should be closed.  *See* 34 C.F.R.
§ 361.56.

---

[3]29 U.S.C. § 723 provides, in relevant part:

Vocational rehabilitation services provided under this title [29 U.S.C. §§ 720 *et seq.*] are
any services described in an individualized plan for employment necessary to assist an
individual with a disability in preparing for, securing, retaining, or regaining an
employment outcome that is consistent with the strengths, resources, priorities,
concerns, abilities, capabilities, interests, and informed choice of the individual,
including–

transportation, including adequate training in the use of public transportation
vehicles and systems, that is provided in connection with the provision of any
other service described in this section and needed by the individual to achieve
an employment outcome[.]

29 U.S.C. § 723(a)(8).

## C.   Statute of Limitations Partially Bars Carrigan's Claims[4]

Carrigan seeks review of VESID's decision to deny transportation services, but defendants argue that such review is partially time-barred by the applicable statute of limitations.  In particular, defendants maintain that Carrigan's challenge to VESID's denial of his request for van modifications is untimely since it was not brought within four months of the Hearing Officer's final decision.

"The Rehabilitation Act, like many civil rights statutes, does not contain a specific limitations period."  *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir. 1994).  "In such situations, Congress has directed the courts to select the most appropriate state statute of limitations to apply to the federal cause of action."  *Id*.; *see also* 42 U.S.C. § 1988(a).  "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."  *McCullough*, 35 F.3d at 129.

Defendants urge the court to apply a four-month statute of limitations to Carrigan's claim.  They argue that the most relevant state statute in this

---

[4]Carrigan does not respond to defendants' statute of limitations argument.

case is Article 78 of the New York Civil Practice Law and Rules, which

contains a four-month statute of limitations for judicial review of agency

decisions.[5]  *See* N.Y. C.P.L.R. § 217.  Second, defendants urge the court

to consider "whether application of that limitations period is consistent with

the federal statute and its underlying policies."  *McCullough*, 35 F.3d at

129.  Naturally, defendants maintain that Article 78's limitation period is

consistent with the Rehabilitation Act since Article 78 proceedings allow for

challenges to final agency decisions which cannot be adequately reviewed

by appeal to a court or some other body or officer.  *See* N.Y. C.P.L.R. §

7801(1).  Defendants further maintain that if Carrigan had chosen to pursue

this action in state court, an Article 78 proceeding would likely have been

his most appropriate vehicle.

Applying Article 78's four-month limitation period, Carrigan's action is

partially time-barred since he did not challenge the denial of his request for

van modifications within four months of the Hearing Officer's April 23, 2003

decision (this action was commenced on August 12, 2005).  As such, the

---

[5]Defendants point out that similar sections of the IDEA are also treated within a four month statute of limitations.  While the IDEA does not contain its own statute of limitations, the Second Circuit has held that claims challenging New York State agency determinations made under the IDEA must be brought within four months of the final termination.  *See Adler v. Educ. Dep't of NYS*, 760 F.2d 454, 456 (2d Cir. 1985); *see also Mackey v. Bd. of Educ. for the Arlington Centr. Sch. Dist.*, 373 F. Supp. 2d 292, 300 (S.D.N.Y. 2005).

challenge in the present action is limited only to the April 15, 2005 decision,

upholding the termination of ambulette transportation services.

Accordingly, any potential challenge to the decision affirming the denial of

van modifications is time-barred and is dismissed.[6]

## D.    Hearing Officer's Decision[7]

---

[6]In the alternative, defendants urge the court not to order VESID to modify Carrigan's Ford E-150 van because such modifications would be unsafe and in violation of the Federal Motor Vehicle Safety Act and the manufacturer's recommendations.  On May 9, 2003, Ford Motor Company issued a bulletin advising all mobility vehicle builders that the E-150 van should not be modified for use as a mobility van.  *See* Ford advisory entitled "Adaptive Mobility E-150."  The advisory warns that the gross vehicle weight ratings could be exceeded if a motorized wheelchair upgrade unit or sophisticated components for driver control or mobility are added.  Here, defendants maintain that all of those options would be necessary in modifying Carrigan's vehicle for his own use.  Doing so would be unsafe, defendants note.  In support of their assertion, defendants cite to an affidavit submitted by George W. Hicks, an expert in rehabilitative technologies.  *See Dkt. No. 30, Ex. 4.*  Mr. Hicks does indeed agree that adding such necessary equipment to Carrigan's Ford E-150 would cause the vehicle to exceed its gross vehicle weight rating and seriously affect the safety features of the vehicle.  Moreover, Hicks points out that modifying a Ford E-150 to accommodate Carrigan's needs would require a lowered floor of approximately six inches.  Performing such a modification would require the fuel tank to be moved to the back of the rear axle where the floor has been modified.  However, because of expanded vehicle emission regulations, manufacturers have drastically reduced the quantity and selection of modified fuel tanks.  As such, at this time there are no fuel tanks available for the Ford E-150.  *See id.*

Carrigan argues that Hick's declaration should be stricken from the record because defendants did not identify him as an expert, pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), within the time mandated by Judge Homer's Pretrial Scheduling Order.  Carrigan claims that Hick's declaration should be considered expert testimony under Rule 702 of the Federal Rules of Evidence because it contains "technical" or "specialized" knowledge.

In response, defendants maintain that they learned months after the expert disclosure deadline that the 2001 Ford E-150 van could not be modified.  Recognizing there was a significant safety issue, defendants sought further guidance from Mr. Hicks.  They concede that they should have asked Carrigan's permission (and the court's) to use the Hicks' declaration.  In any event, Carrigan does not dispute defendants' statute of limitations argument, rendering any potential challenge to the denial of van modifications time-barred.

[7]The court's analysis only discusses in detail the second hearing, held in January 2005, since that is the focus of the parties' discussion.  The first hearing, held in April 2003, dealt with the denial of Carrigan's request for modifications made to his Ford E-150 van.  Because the

On April 15, 2005, the Impartial Hearing Officer denied Carrigan's request for further transportation to Montreal.  He also found that Carrigan's employer was unreasonable in expecting Carrigan to secure state-funded transportation two or three times per month to travel to Montreal (200 miles away) for a job that employed Carrigan for only 15 hours per week. Transportation to Montreal cost the State more than $10,000.00 per year, but Carrigan earned less than $7,000.00 per year.

The relevant VESID policy provides, in part:

> VESID will only support the most cost-effective option that leads to the individual's employment goal and that is required to meet the individual's needs....Cost effectiveness is determined by comparing cost, level of integration, duration, quality, timeliness, proximity and appropriateness of service options required to meet the individual's needs.

VESID policy 100.00.  This policy is authorized by section 1004 of New York's Education Law.  See N.Y. EDUC. LAW § 1004(9) ("Services shall be provided at a cost not to exceed that which is necessary and reasonable.").

Defendants argue that the cost-effectiveness analysis did not weigh in favor of continuing Carrigan's transportation services to Montreal.  For

_____

court concurs with defendants' statute of limitations argument, it declines to consider the merits of Carrigan's challenge to defendants' denial of van modifications.

over two years, VESID provided Carrigan with transportation services,

including two van conversions.  Without advising VESID, Carrigan sold his

Dodge Caravan, despite the fact that it had approximately $60,000.00 in

modifications made to it by VESID.  He subsequently purchased a Ford E-

150 van.  The Hearing Officer found that even though VESID had paid over

$10,000.00 to provide ambulette services to Carrigan, there was no

requirement in the IPE that VESID continue this service.[8]

Carrigan maintains that Title I's clear statutory test for determining

what services should be provided in an IPE is whether the vocational

rehabilitation service requested is *necessary* to assist the individual's

employment goals.  Indeed, as stated above, 29 U.S.C. § 722(b)(3)(B)(i)

reads:

> an individualized plan for employment shall, at a minimum, contain
> mandatory components consisting of...a description of the specific
> vocational rehabilitation services that are:

---

[8]In September 2003, Carrigan and VESID modified Carrigan's IPE.  The alteration reflected his new work as a "sales representative, recreation and sporting goods."  However, the only type of services identified in the IPE provided for rehabilitation services, and there was no mention of transportation services.  On April 5, 2004, Carrigan's IPE was modified to provide ambulette services starting on April 7, 2004 and ending on April 8, 2004.  From April 23 - January 14, 2005, the IPE was modified several times to authorize ambulette services to Montreal.  Each change had a beginning and end date.  *See* R. 279-321.  The final IPE modification, dated January 14, 2005, authorized ambulette service until January 31, 2005.  *See* R. 294.  There was no further understanding that VESID would continue to provide ambulette services.

> ...needed to achieve the employment outcome, including, as appropriate, the provision of assistive technology devices and assistive technology services...and...

> provided in the most integrated setting that is appropriate for the service involved and is consistent with the informed choice of the eligible individual.

29 U.S.C. § 722(b)(3)(A), (B)(i)(I), (II).  In interpreting this language, Carrigan argues that the Hearing Officer failed to consider whether the requested services were "necessary to assist [him] in...retaining...his employment outcome" at I-Tech.  29 U.S.C. § 723(a).  Carrigan maintains that the Hearing Officer ignored this statutory test and instead upheld VESID's decision to deny services based on impermissible "cost-effectiveness concerns."  R. 345.

Second, Carrigan maintains that VESID's discretion is limited under Title I by Carrigan's individual needs.  In support of this proposition, he cites *Marshall v. Switzer*, 10 F.3d 925 (2d Cir. 1993), in which the Second Circuit explained the scope of VESID's discretionary authority in determining what rehabilitative services were necessary.  The *Marshall* court explained:

> Nothing in the statute or regulations, however, gives a participating state discretion to prohibit under all circumstances the provision of goods or services listed in § 723(a).  *See* 29

17

U.S.C. § 721(a)(8).  Moreover, whatever discretion states may have in providing services is limited by Title I's pervasive policy of tailoring the provision of services to meet the individual needs of each client....

*Marshall*, 10 F.3d at 929-30.[9]

Carrigan argues, based on his interpretation of this language, that his need for ambulette services limits whatever discretion VESID may have under Title I.  On the other hand, defendants maintain that there is no express requirement in § 723 that all of the services requested by the client be provided.  Defendants argue that Carrigan's interpretation of the language is in conflict with both 29 U.S.C. § 723(a) and Congress's legislative findings, set forth in 29 U.S.C. § 701(a)(4) (which contemplates a "reasonableness" component to such services).

Defendants point out that Carrigan's reliance on *Marshall* is misplaced.  The plaintiff in *Marshall* challenged a VESID policy that applied across the board.  At the time of the *Marshall* litigation, individuals had no

---

[9]In *Marshall*, a VESID client filed a 42 U.S.C. § 1983 action, claiming that its policy of prohibiting reimbursement for vehicle modifications violated Title I of the Rehabilitation Act of 1973 (Title I), 29 U.S.C. § 720 *et seq*. The district court (Judge Scullin) held that the client was not entitled to bring suit under Section 1983 based on Rehabilitation Act allegations. The Circuit vacated the trial court's judgment granting defendant's motion to dismiss and held that plaintiff was entitled to bring his claim under § 1983.  *See Marshall v. Switzer,* 10 F.3d 925 (2d Cir. 1993).

Five years after this decision, a private right of action, promulgated at 29 U.S.C. § 722(c)(5)J), was added to Title I by the Rehabilitation Act Amendment of 1998.

private right of action to challenge a violation of Title I, and the court held that the *Marshall* plaintiff could pursue his challenge to an across-the-board policy under 42 U.S.C. § 1983.  In doing so, the court differentiated between an across-the-board policy and a Hearing Officer's individual determination based on a particular client's needs (which the court implied would not have been permitted as a private right of action under Section 1983).  As such, defendants maintain that Carrigan's reliance on *Marshall* is misplaced.

In addition, defendants cite *Murphy v. VESID*, 92 N.Y.2d 477, 484 (1998), in which the New York Court of Appeals unequivocally found that by utilizing words like "opportunities," "meaningful," "gainful employment," and "reasonable accommodations," Congress did not intend to provide VESID clients with unlimited rehabilitative resources under Title I.  As such, VESID maintains that it did not violate Title I of the Rehabilitation Act when it considered cost-effectiveness in denying Carrigan's requested services. *See Murphy*, 92 N.Y.2d at 481 ("It is clear to this Court that the realistic and laudable legislative goal is to empower eligible individuals with the opportunity to access their maximum employment, not to provide individuals with idealized personal preferences for actual optimal

employment....The Act...[does not] guarantee[ ] actual optimal

employment.").[10]

Thus, the core of the issue is whether VESID has discretion (and, if

so, how much) to tailor the rehabilitative services requested by the

individual and to consider cost in determining whether services will be

granted.[11]  Defendants point to 29 U.S.C. § 722(b), explaining that while an

───────────────────

[10]In *Murphy*, a disabled person sought review of the Appellate Division's order affirming judgment in favor of VESID, declaring that VESID was not required to pay costs associated with appellant's law school education. *See Murphy v. VESID*, 92 N.Y.2d 477 (1998). The court determined that the dispositive issue was whether New York's VESID, pursuant to U.S.C. § 701 *et seq*. and its State implementation, must provide services to a recipient of benefits, for as long as the beneficiary has not yet attained optimal employment. *See id*.  The court held that the plain language of the Act supported the conclusion that appellant was not entitled to VESID funding for her law school education.  *See id*.  Further, the legislative development of the Act's provisions confirmed the plain reading approach adopted by the court.  The court further held that the legislative goal was to empower eligible individuals with the opportunity to access their maximum employment, not to provide individuals with idealized personal preferences for actual optimal employment.  *See id*.

[11]Carrigan argues that cost can be factored in only when VESID implements an "order of selection" process, assuring individuals with the most severe disability priority in obtaining services.  It follows, as Carrigan claims, that since VESID had not implemented an order of selection process, it cannot consider cost in determining services.

29 U.S.C. § 721(a)(5) provides,

> In the event that vocational rehabilitation services cannot be provided to all eligible individuals with disabilities in the State who apply for the services, the State plan shall...show the order to be followed in selecting eligible individuals to be provided vocational rehabilitation services.

29 U.S.C. § 721(a)(5)(A).  However, as defendants correctly point out, the *Murphy* court explicitly rejected this argument.  *See Murphy*, 92 N.Y.2d at 487-88 ("It is plain to us, however, that when an individual's goals and needs have been defined...the agency may appropriately factor in the cost of providing services within the prescribed procedural framework....This proper consideration of economic factors with respect to an individual's [plan] is distinguished from an Order of Selection which considers the funding available to an individual, relative to all other eligible applicants.").

individual and a VESID counselor develop an IPE together, "[i]t is VESID

that makes the final decision with respect to the contents of the [IPE],

including the listed goal, eligibility and scope of services to be provided."

*Murphy*, 92 N.Y.2d at 488.  "'Joint' participation in developing the [IPE]

does not mean giving eligible applicants final or exclusive decision making

authority to determine their own goals."  *Id.*  "Analogously, VESID should

have the same final authority with respect to determining whether an [IPE]

can be amended to change the previously jointly agreed upon goal."  *Id*.

The *Murphy* court ultimately held that it was not inappropriate for VESID to

refuse further funding for Murphy.  *See id.*

Carrigan proffers a number of arguments, suggesting that VESID has

little authority to consider cost in determining the services granted to

disabled individuals.  Most of his arguments are *non sequitur* assertions,

entirely irrelevant to the ultimate issue and non-persuasive.

First, Carrigan points out that VESID does not have to provide

particular rehabilitation services to disabled individuals if "comparable

services and benefits are available under any other program."  29 U.S.C. §

721(a)(8)(A)(i).  As such, Carrigan maintains that VESID is a "payer of last

resort."  Here, VESID and Carrigan explored, without success,[12] other

comparable service programs such as Social Security work incentive

programs.[13]

Second, Carrigan points out that VESID can seek reimbursement for

expenditures made on behalf of disabled individuals who are also

recipients of Social Security Disability benefits under Title II of the Social

Security Act.  Since Carrigan is a recipient of such benefits, he argues that

---

[12]The alternative programs did not supply the type of rehabilitative technology services Carrigan requested.

[13]Defendants argue that because Carrigan had been employed with the same employer since 1993, his request in April 2004 for temporary transportation was consistent with a request for "post-employment services" as that term is defined in 34 C.F.R. § 361.5(42).  The U.S. Department of Education differentiates these services from typical vocational rehabilitation services.  The relevant regulation provides:

> Post-employment services means one or more of the services identified in § 361.48 that are provided subsequent to the achievement of an employment outcome and that are necessary for an individual to maintain, regain, or advance in employment, consistent with the individual's strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice....Post-employment services are intended to ensure that the employment outcome remains consistent with the individual's strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice. These services are available to meet rehabilitation needs that do not require a complex and comprehensive provision of services and, thus, should be limited in scope and duration.  If more comprehensive services are required, then a new rehabilitation effort should be considered.  Post-employment services are to be provided under an amended individualized plan for employment; thus, a re-determination of eligibility is not required.

34 C.F.R. § 361.5(42). Defendants maintain that Carrigan had an allegedly short-term need to travel to Montreal, and VESID agreed to provide this transportation to him on a limited basis.
    Defendants maintain that, at this point, it would be more appropriate for Carrigan and VESID to work together to initiate a new rehabilitation effort, requiring less long-distance traveling and reasonable transportation alternatives.

VESID has the opportunity to seek payment from the Social Security

Administration to offset some of its costs.  As such, Carrigan maintains that

the cost of his services would not be as burdensome as VESID suggests.

Third, Carrigan claims that VESID does not have policies in place,

setting forth a description of criteria used to determine whether a disabled

individual is on the right path to achieving his employment goal, as required

in every individual's IPE.  *See* 29 U.S.C. § 722(b)(3)(D) (All IPEs must

include "a description of criteria to evaluate progress toward achievement

of the employment outcome.").

Finally, Carrigan cites policy directives (PD)[14] from the Rehabilitation

Services Administration (RSA), a subagency of the U.S. Department of

Education, whose statutory purpose is "carrying out" Title I.  *See* 29 U.S.C.

§ 702(a).  RSA PD 97-04 states:

> The cost or the extent of VR services that an eligible individual may
> need to achieve a particular employment goal should not be
> considered in identifying the goal in the individual's IPE....Once the
> employment goal is identified, however, cost becomes a relevant
> factor in determining an appropriate, cost efficient means of providing
> needed VR services.  In this regard, [VR agencies] are authorized to

---

[14]According to Rehabilitation Services Administration, a policy directive is "a formal statement of required action(s) or condition(s) that must be carried out or met by state VR agencies or other RSA grantees in order to be in compliance with the Acts.  A PD is legally enforceable because it is based on a statutory or regulatory provision."  *Available at*, http://www.ed.gov/policy/speced/guid/rsa/index.html.

> employ cost efficiency strategies that are consistent with federal law,
> such as financial needs tests, and also are obligated to locate
> available comparable services and benefits for certain VR services.

Interpreting this language, Carrigan argues that VESID may not factor cost

into determining an individual's employment outcome.  Indeed, the above

statement expressly implies that cost may not be considered in determining

an individual's *employment outcome*.  However, Carrigan fails to address

the subsequent language that does grant VESID authority to consider cost

as a relevant factor in determining *how to carry out* the individual's

employment outcome.

In sum, Carrigan argues that the appropriate test for determining

whether he was entitled to continued ambulette services is whether they

are "necessary to assist" the individual in "retaining...his employment."  29

U.S.C. § 723(a).  He contends that the record clearly establishes the need

for transportation to and from Montreal to assist him in retaining his

employment.

Even considering all of the above, the court must give "due weight" to

the Hearing Officer's determination.  The rationale for denying Carrigan's

requests is the following: the trips to Montreal cost VESID approximately

$10,000.00, while Carrigan only earns approximately $7,000.00 per year.

24

Even though Carrigan's employer submitted a letter stating that Carrigan "must be on hand" for meetings in Montreal several times per month, Carrigan has continued to work at I-Tech without transportation since January 2005.  VESID simply maintains that such transportation is not cost-effective, and there are other options that should be explored.  The court, in giving due weight to the Hearing Officer's decision, finds no discernable legal problem with VESID's denial of rehabilitative services under the circumstances.  Accordingly, defendants' motion for summary judgment is granted, and Carrigan's cross-motion for summary judgement is denied.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (*Dkt. No. 30*) is **GRANTED**; and it is further

**ORDERED** that the Carrigan's cross-motion for summary judgment (*Dkt. No. 37*) is **DENIED**; and it is further

**ORDERED** that Carrigan's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties.

25

**IT IS SO ORDERED.**

May 1, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge